UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DENITA HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1422 (RCL) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Now before the Court comes plaintiff Denita Harris's Motion for Summary Judgment [12] and defendant District of Columbia's Cross Motion for Summary Judgment [13]. Upon consideration of the motions, plaintiff's reply [16], defendant's reply [17], the entire record herein, and applicable law, the Court will GRANT plaintiff's motion and DENY defendant's motion.

## I.   BACKGROUND

Plaintiff Denita Harris filed this suit under the Individuals with Disabilities Education Act against defendant District of Columbia, seeking relief for defendant's alleged failure to provide a free appropriate public education for plaintiff's daughter, D.H. Plaintiff in her complaint seeks the following relief: (1) order compelling defendant to fund an independent functional behavioral assessment for D.H. and to subsequently develop an appropriate educational plan; and (2) attorneys' fees and costs. Subsequent to filing her complaint, plaintiff moved for summary judgment on all claims. Defendant responded by filing its own cross motion

for summary judgment. Both motions are currently before the Court.

### A.     **Factual Background**

D.H. is an eleven-year-old girl currently attending school at Rock Creek Academy. (Pl. Statement of Material Facts Not in Dispute ¶ 1.) She has been diagnosed with multiple disabilities, and the District of Columbia Public Schools ("DCPS") has accordingly determined that she needs to participate in a special education program. (*Id.* ¶ 3.)

In order to develop an appropriate education plan for D.H., and pursuant to the Individuals with Disabilities Education Act ("IDEA"), DCPS performed a functional behavioral assessment ("FBA") on April 28, 2006. (*Id.* ¶ 4.) Plaintiff felt that the DCPS-sanctioned FBA was inadequate, so she requested funding on February 8, 2007 for an independent FBA in accordance with her rights under 34 C.F.R. § 300.502(b)[1]. (*Id.* ¶ 7.) DCPS failed to act on the request, and plaintiff in response filed an administrative due process complaint on March 2, 2007. (*Id.* ¶¶ 8-10.)

A hearing officer from the DCPS State Enforcement and Investigation Division heard the case and denied plaintiff's request that DCPS fund an independent FBA. (Compl. ¶ 12.) The hearing officer understood the issue before the court as focusing on whether an FBA may be considered an "educational evaluation" under 34 C.F.R. § 300.502. (R. at 4.) In a brief decision, the hearing officer determined that an educational evaluation is "an evaluation to confirm or rule

---

[1] "A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency. If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either (i) file a due process complaint to request a hearing to show that its evaluation is appropriate, or (ii) ensure that an independent educational evaluation is provided at public expense."

out one of the disabilities setout [sic] at 34 C.F.R. § 300.8(c)" and asserted that an FBA could not be considered such an evaluation. (*Id.*) Plaintiff responded by filling this action, pursuant to 20 U.S.C. § 1415(i)(2)(A), to overturn the hearing officer's decision.

  **B.**  **Statutory Background**

  In enacting the IDEA in 1970, Congress recognized that "improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." Individuals with Disabilities Education Act, 20 U.S.C. § 1400(c)(1) (2005). Before passage of the legislation, Congress contended that disabled children's needs were not being met because they "did not receive appropriate educational services," and "undiagnosed disabilities prevented the children from having a successful educational experience." *Id.* § 1400(c)(2).

  Almost thirty-five years after the initial enactment of the IDEA, Congress reaffirmed its commitment to providing quality educational services to children with disabilities through its 2005 amendments. *See id.* § 1400(c)(4). The impetus for revising the statute stemmed from the observation that "the implementation of this chapter has been impeded by low expectations and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." *Id.* In response to this perceived hindrance to maximal progress under the statute, Congress stressed that it remained committed to "ensur[ing] that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." *Id.* § 1400(d)(1)(A).

The Supreme Court has recognized that "the primary vehicle for implementing these Congressional goals is the individualized education program, which the [IDEA] mandates for each child." *Honig v. Doe*, 484 U.S. 305, 311-12 (1988). An individualized education program ("IEP") is a "written statement for each child with a disability that is developed, reviewed, and revised . . . ." 20 U.S.C. § 1401(15). In view of the centrality of the role of the IEP in affording appropriate education to every child with a disability, Congress explicitly provided for frequent and thorough monitoring and revising of the program. *See id.* § 1414. The breadth of the IEP extends beyond purely academic concerns, including under its compass "the use of positive behavioral interventions and supports." *Id.* § 1414(d)(3)(B)(I).

The IDEA establishes a comprehensive framework of procedural safeguards in an effort to further the realization of its far-reaching goals. *See id.* § 1415. Parties may first raise grievances at an impartial administrative hearing conducted by a hearing officer. *See id.* § 1415(f). If unsatisfied with the results of the administrative hearing, parties may then appeal the hearing officer's decision in a civil action. *Id.* § 1415(g). To compensate parties for costs associated with seeking relief, the IDEA expressly gives courts the right to award attorneys' fees to a prevailing party provided the party is the parent of a child with a disability. *Id.* § 1415(i)(2)(B)(i)(I).

Of particular relevance to this case is the regulatory provision affording parents "the right to an independent [IEP] at public expense if the parent disagrees with an evaluation obtained by the public agency." Independent Educational Evaluation, 34 C.F.R. § 300.502(b) (2006). Faced with a parental request for such an independent educational evaluation, "the public agency must, without unnecessary delay, either (i) file a due process complaint to request a hearing to show

that its evaluation is appropriate, or (ii) ensure that an independent educational evaluation is provided at public expense." *Id.*

## II.   ANALYSIS

### A.   Standards for Summary Judgment

Summary judgment is appropriate where the record before the court "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Affording substantial deference to the nonmoving party, the summary judgment standard mandates that "all inferences must be viewed in a light most favorable to the non-moving party." *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and summary judgment is appropriate against only those parties "who fail[] to make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has stressed that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Co.*, 475 U.S. 574 (1986).

Where, as here, questions of law predominate, summary judgment is "particularly appropriate." *Wyo. Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 7 (D.D.C. 2001). A court may determine the import of applicable law in disposing of a motion for summary judgment. *See, e.g.*, *Rude v. The Dancing Crab at Wash. Harbor, LP*, 245 F.R.D. 18, 24 (D.D.C. 2007);

*Daul v. Meckus*, 897 F. Supp. 606, 611-12 (D.D.C. 1995); *see also NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 682 (D.C. Cir. 1985) (holding judge appropriately may dispose of question of law in summary judgment motion where resolution of the case turned on interpretation of contract whose language was unambiguous).

  B. **Standards for Review of Administrative Decisions Under the IDEA**

  The IDEA states simply that in reviewing administrative decisions under the IDEA, courts should base their decisions on the "preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(c). Courts have held that review of agency determinations in IDEA cases is more rigorous than in "typical agency cases," reasoning that the "IDEA plainly suggest[s] less deference than is conventional in administrative proceedings." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005).

  When review of an administration decision under the IDEA focuses solely on statutory interpretation, such an inquiry is a "pure question of law that courts review de novo." *Id.* (holding hearing officer's decision was entitled to no deference because it centered on interpretation of statutory language). Moreover, "a hearing decision without reasoned and specific findings deserves little deference." *Id.* (internal quotation marks omitted).

  Implicitly conceding that the hearing officer's paragraph-long decision could be classified as one "without reasoned and specific findings," DCPS nevertheless argues that the decision was not a pure matter of statutory interpretation, but rather an instance where the hearing officer used his unique expertise to determine whether an FBA was so essential to developing an IEP that it could properly be classified as an educational evaluation. (Def. Reply 2.) DCPS's contention ignores the obvious: the hearing officer's brief memorandum patently

states that the issue before him was confined to "[whether an FBA is] an educational evaluation." (R. at 4.) Since the hearing officer's decision was therefore purely a matter of statutory interpretation, and he provided no support for his decision, the determination is entitled to no deference, and this Court will review the claim de novo.

### C.     Evaluations Under the IDEA

#### 1.     Statutory Interpretation

Plaintiff argues that an FBA is considered an "educational evaluation" as stated in 34 C.F.R. § 300.502 (hereinafter "Section 300"), because it is central to the development of the IEP. (Pl. Mot. Summ. J. 7-9.)  DCPS counters by contending that the FBA is not an "educational evaluation," since it is merely a tool to help students with behavioral, not educational, problems. (Def. Cross Mot. Summ. J. 8.)  In view of the IDEA's statutory framework and the centrality of the FBA to development of a successful IEP, this Court agrees with plaintiff's contention that the FBA is an "educational evaluation" as stated in Section 300.

The regulations implementing the IDEA nowhere define "educational evaluation," but they do stress the broad scope of evaluations in general, defining "evaluation" as "procedures used . . . to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs."  34 C.F.R. § 300.15.  Evaluations must take into account a holistic perspective of the child's needs, and the evaluating agency accordingly is compelled to "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors."  *Id.* § 300.304.  Indeed, Congress in proposing its 2005 amendments to the IDEA stressed the need to "focus resources on teaching and learning," while mitigating procedural hurdles, in an effort to

ensure a disabled child's "access to the general education curriculum in the regular classroom [] *to the maximum extent possible*."  20 U.S.C. § 1400(c)(5) (emphasis added).

In an attempt to further Congress' ambitious goals for the IDEA, the Supreme Court has focused on the centrality of the IEP as "the centerpiece of the statute's education delivery system for disabled children."  *Honig*, 484 U.S. at 311.  As such, an evaluation's primary role is to contribute to the development of a sound IEP.  *Cf. id.* at 311-12.  The IDEA further recognizes that the quality of a child's education is inextricably linked to that child's behavior, and hence an effective educational evaluation must identify behavioral problems: "the IEP team must, in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 300.324(a)(2)(i).

The FBA is essential to addressing a child's behavioral difficulties, and, as such, it plays an integral role in the development of an IEP.  (*See* Pl. Mot. Summ. J. Ex. 3 (stating FBA is performed to determine causes of a child's behavior and the concomitant consequences of that behavior).)  As shown in the FBA of D.H. performed by DCPS, the information gleaned from the assessment is central to formulating an IEP tailored to the needs of individual disabled children.  (*See id.* Ex. 2 (listing several recommendations stemming purely from findings made during FBA of D.H.).)  The FBA's fundamental connection to the quality of a disabled child's education compels this Court's determination that an FBA is an "educational evaluation" for purposes of Section 300.

**2.     Revisions of a Child's IEP**

DCPS next argues that, even assuming an FBA is an "educational evaluation" under Section 300, the performance of an independent assessment is wholly unnecessary because the school has already developed an effective IEP for D.H.  (Def. Cross Mot. Summ. J. 8.)  DCPS's assertion is contrary to the mandate of the IDEA and is thus utterly unpersuasive.

The IDEA is replete with provisions emphasizing the necessity of monitoring the IEP for revision purposes.  *E.g.*, 20 U.S.C. § 1414 (stating reevaluations shall occur at request of parents provided they do not total more than one per year).  Indeed, the Supreme Court forcefully declared that continual evaluations were necessary, and parents must have the ability to seek redress for a school's failure to sufficiently monitor a child's progress under the IEP: "aware that schools had all too often denied [disabled] children appropriate educations without in any way consulting their parents, Congress repeatedly emphasized throughout the [IDEA] the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness."  *Honig*, 484 U.S. at 311-12.

At this point, an FBA of D.H. has not been performed for over two years.  (*See* Pl. Statement of Material Facts Not in Dispute ¶ 4.)  DCPS's failure to appropriately monitor D.H.'s progress under the IEP, and accordingly revise the plan to mesh with her needs, violates the clear mandate of both the IDEA and the Supreme Court.  Defendant is therefore misguided in contending that a lapse of two years between evaluations is insufficient to confer on plaintiff a right to seek an independent FBA.

### 3.     Defendant's Procedural Argument

Defendant finally points to the text of IDEA[2] in arguing that DCPS's failure to act on plaintiff's request for a publicly funded independent FBA was a mere procedural violation, and that nothing in the record shows D.H. was plagued by obstacles preventing her from receiving a free appropriate public education ("FAPE") as a result of the inaction. (Def. Cross Mot. Summ. J. 9-10.) Accordingly, the argument continues, plaintiff is not entitled to her requested relief at this stage. (*Id.*) Defendant's argument lacks merit and must be dismissed.

To begin with, failure to act on a request for an independent evaluation is certainly not a mere procedural inadequacy; indeed, such inaction jeopardizes the whole of Congress' objectives in enacting the IDEA. *See* Part II C 1-2, *supra*. Nevertheless, even accepting defendant's assertion that plaintiff's complaint describes a procedural violation, its argument still fails. D.H. has languished for over two years with an IEP that may not be sufficiently tailored to her special needs. The intransigence of DCPS as exhibited in its failure to respond quickly to plaintiff's simple request has certainly compromised the effectiveness of the IDEA as applied to D.H., and it thereby constitutes a deprivation of FAPE. Plaintiff is accordingly entitled to full relief under the statute.

---

[2] 20 U.S.C. § 1415(f) states that if an administrative complaint involves only procedural issues, a hearing officer may find the child is entitled to full relief as a violation of the IDEA only if procedural inadequacies "impeded the child's right to free appropriate public education."

**III.    CONCLUSION**

For the foregoing reasons, the Court concludes that plaintiff's Motion for Summary Judgment will be GRANTED, and defendant's Cross Motion for Summary Judgment will be DENIED.

A separate order shall issue this date.


Signed by Chief Judge Royce C. Lamberth, on June 23, 2008.